221 A.2d 806.

THE SCHOOL COMMITTEE OF THE CITY OF PAWTUCKET *vs.* PAWTUCKET TEACHERS ALLIANCE, LOCAL NO. 930, AFT, AFL, *et al.*

JULY 25, 1966.

PRESENT: Roberts, C. J., Paolino, Powers and Joslin, JJ.

244

PAOLINO, J. This bill in equity was brought in the name of the school committee of the city of Pawtucket for injunctive relief. On March 12, 1965, an ex parte restraining order was entered by a justice of the superior court restraining the respondents in accordance with the prayers of the bill. Thereafter, on March 26, 1965, the complainant filed a petition to adjudge the respondents in contempt for allegedly violating said restraining order. On June 14, 1965, after a hearing in the superior court, a decree was entered by a justice of that court finding the respondent alliance and the six members of its negotiating committee guilty of civil contempt and imposing suspended fines on each of the respondents. The cause is before this court on the respondents' appeal from such decree.

The bill of complaint, which is signed under oath by four members of the committee, was filed on March 12, 1965. The trial justice issued the restraining order principally on the basis of complainant's allegations that respondents went on strike in 1957, as well as in 1964, and were threatening to strike again. It restrained the alliance and the members of the negotiating committee from:

" * * * proposing, adopting, or approving any vote or resolution declaring a strike of the teachers, members of the Teachers Alliance; agreeing to any concerted action to remain away from their classes so as to disrupt or interfere with the normal school program or curriculum; from entering into, making or carrying out any agreement under whatever name or by whatever manner or means arrived at, openly or secretly, the effect of which is to collectively remain away from their classes and responsibilities as teachers; from disrupting in any manner the school program or curriculum; from taking any steps to interfere with the normal activities of the teachers and students in the public schools of the City of Pawtucket, and from carrying out, adhering to or following any so-called strike, vote

or order, if any such vote or order has been taken or given."

The issues raised in this proceeding result from the failure of the parties to negotiate a mutually satisfactory contract affecting compensation and working conditions. It appears that because of such failure the members of the alliance voted on March 2, 1965 to return to school "on a day-to-day basis" and authorized their president to call an "emergency meeting" within two weeks, which he did. However, because of the great public interest involved, His Excellency, Governor John H. Chafee, intervened and arranged a meeting between the parties for March 12, 1965 in his office. The alliance postponed their emergency meeting to March 14, 1965.

The meeting in the Governor's office was attended by several interested persons, including representation of respondents and five members of the school committee. Two members of the committee were not present. It appears that the committee had been acting as a six-member committee for many months because of the absence of one member whose whereabouts was unknown. During the course of this meeting, after it appeared that the parties could not reach an agreement, the chairman and three other members of the committee decided to seek a court injunction. They signed the instant bill of complaint at that time. The fifth member of the committee disapproved such action and refused to sign the bill.

The cause was set down for hearing on the prayer for preliminary injunction on March 22, 1965. However, by agreement, no hearing was held on that day and the restraining order remained in effect. The alliance met on March 14, 1965 and the members voted approval of the negotiating committee's recommendations that the teachers would remain in their classrooms, that they would resume negotiations with the school committee, that they would

forego a 1964-1965 contract, and that they would report to the alliance membership on their progress.

The parties held further negotiating meetings on March 16 and March 23, 1965. A disagreement arose as to the order in which the items on the agenda should be considered. The complainant insisted that matters involving monetary items be taken up first so that it could prepare and file its budget with the city council before the March 31, 1965 deadline. The respondents, on the contrary, insisted that certain other nonbudgetary items in their 30-point proposal be taken up first. As a result of this disagreement the March 23 meeting ended in an impasse.

The respondents met that evening and discussed the calling of a special meeting of the alliance for the following night, March 24, 1965. The president of the alliance accordingly called a special meeting for March 24, 1965 at 8:15 p.m. It appears that the negotiating committee met again on March 24 together with the national representative of the American Federation of Teachers; that at this conference they discussed the restraining order and what their report to the alliance membership should be; and that they composed a written statement[1] which was to be read to the members of the alliance at the special meeting and which we shall refer to as "the statement."

---

[1] "On the basis of the highest law of the land, the Constitution of the United States, and specifically the Thirteenth Amendment which prohibits forced and involuntary servitude, and on the basis of the decision of the Supreme Court of the State of Rhode Island which cites *Manchester* vs. *Manchester Teachers' Guild, 1-100 New Hampshire, 507, 512,* 'the preliminary injunction restrained the concerted action of the respondents but did not in any way impose on any individual the obligation to work against his will.'

"On this legal basis and owing to the conditions existing in the Pawtucket School System, I, Gregory W. Coughlin, as an individual, will not work in the Pawtucket School System until true collective bargaining prevails between my Teachers Alliance and the School Committee of the City of Pawtucket."

Between 300 and 350 teachers attended the March 24 meeting. The negotiating committee reported on the status of negotiations and after some discussion each of the members of the negotiating committee and the president of the State Federation of Teachers read the statement, each inserting his own name as the declarant, and the assembly acknowledged each reading with a standing ovation. On March 25, 1965 approximately 370 of the 481 teachers in the Pawtucket school system failed to report to their duties. This situation continued for nine successive school days and during this period classes for 11,350 pupils were suspended.

On March 26, 1965, complainant filed the instant petition to adjudge respondents in contempt. This petition was heard on various days between April 1 and May 25, 1965. On April 6, 1965, the trial justice proposed that respondents use their best efforts to get the teachers back to school as the first step towards reopening negotiations. It appears that respondents complied with such proposal and that on the following day the schools were fully staffed and in substantially normal operation. Thereafter the parties continued their negotiations under the supervision of the trial justice. On May 25, 1965 he rendered his decision and on June 14, 1965, he entered a decree based thereon.

After stating that the cause was heard on complainant's petition to adjudge respondents in contempt and on the latters' motion to dismiss,[2] the decree contains specific findings of fact that (1) both the filing of the bill of complaint and the filing and prosecution of the petition to adjudge in contempt were legal actions duly taken by the school committee; (2) that the members of the negotiating committee and the alliance violated the March 12, 1965 re-

----

[2]On April 6, 1965 respondents filed a motion to vacate restraining order, to dismiss bill of complaint, and to dismiss petition to adjudge in contempt.

straining order by effecting a work stoppage of more than 300 public school teachers commencing March 25, 1965; and (3) that there was no deliberate intent on the part of respondents to flout the dignity of the court.

On the basis of such findings the decree concludes that respondents are not guilty of criminal contempt, but that each of the individual respondents and the alliance is guilty of civil contempt. The decree contains an order denying respondents' motion to dismiss and imposes a fine in the sum of $5,000 on the alliance and $500 upon each of the members of the negotiating committee, but suspends the execution thereof in each instance so long as the respective respondents remain in compliance with the March 12, 1965 restraining order and with any other orders which might thereafter be issued against such respondents in said cause, until such order or orders are terminated or modified by a court of competent jurisdiction.

The respondents have briefed and argued their reasons of appeal under seven main points. For convenience we shall treat them in like manner. Their first point relates to their motion to vacate the restraining order and to dismiss the bill of complaint and the petition to adjudge in contempt.

The rules and regulations of the school committee are in evidence. We need only refer to chap. II, sec. 3, which provides in part that: "The Chairman may take emergency action, if such action is required before a special meeting of the Committee can be called. He must, however, get the Committee's approval of his emergency action *not later than* the next special or regular meeting." (italics ours)

The respondents contend that the school committee had not brought these actions in accordance with school committee rules. They argue, therefore, that the school committee had no lawful authority to bring the bill and the petition to adjudge in contempt and that the superior court

lacked jurisdiction to issue the restraining order. More specifically, they claim that the decision to bring such actions was never voted upon by the members of the school committee at any regular or special meeting of the committee. In fact, the parties stipulated that except for what happened at the meeting in the Governor's office on March 12, the matter of filing the bill of complaint seeking the restraining order and of filing the petition to adjudge in contempt was never taken up at any regular or special meeting of the school committee. They also stipulated that there had been at least one regular or special meeting subsequent to the time each of those actions was filed.

Assuming arguendo that respondents' motion was properly before the trial justice, see *United States* v. *United Mine Workers of America*, 330 U. S. 258, 289-295, in our judgment the record supports the finding of the trial justice, as set forth in paragraph 1 of the decree, that the actions in question were duly taken by the school committee. We note here that in light of the testimony concerning the unexplained absence for a long time of one of the committee members that the committee was, necessarily, operating as a six-member committee and we must treat it as such in considering this proceeding.

The record clearly indicates the existence of an emergency flowing from the inability of the school committee and respondents to agree on basic issues. The situation grew so bad that a meeting of the school committee and respondents was called at the request of the Governor in an attempt to avert a threatened disruption of the school program and to keep the schools open. Five of the six school committee members were present at this meeting. As previously stated, when it appeared that the parties could not reach an agreement, the chairman and three other members of the committee decided to seek an injunction. This action took place in the Governor's office on March 12, 1965,

at a time when the committee was meeting as a committee. It appears to us that the requirements for committee action were substantially complied with. In any event the members, having been notified of such meeting, knew that the purpose of the meeting was to do everything possible to avert a breakdown in the functioning of the school system.

Under chap. II, sec. 3, the chairman had the authority to take emergency action. The bill of complaint was filed at his request with the approval of three other members of the committee. This was committee action and there was compliance with the requirements of chap. II, sec. 3, which provides that he get committee "approval of his emergency action not later than the next special or regular meeting." He obtained such approval on March 12, 1965 from three other members of the committee. In our opinion this satisfied the rule and no further approval was necessary. This authorization implicitly included approval for whatever action would be reasonably necessary to achieve the purposes of the bill, including the filing of the petition to adjudge in contempt.

The respondents' contention under point II that the restraining order is ambiguous and reasonably susceptible to more than one interpretation is so lacking in merit as to require little discussion. The restraining order clearly enjoined a strike or collective work stoppage, whether by vote or resolution or agreement, "under whatever name or by whatever manner or means arrived at, openly or secretly * * *." The restraining order in this proceeding meets the test prescribed in *Sunbeam Corp.* v. *Ross-Simons, Inc.*, 86 R. I. 189, 194.

The trial justice found, as appears from paragraph 2 of the decree, that respondents violated the order by effecting a work stoppage of more than 300 teachers. He based this finding on his conclusion that the reading of the statement by the six individual respondents in the atmosphere in

which they did constituted a concerted activity calculated to bring about a work stoppage or strike and that in fact it did so result. In our judgment such finding is supported by the evidence and, in light of what we have stated above, their violation thereof cannot be nullified on the ground that the order was ambiguous. The doctrine of *Jackowitz* v. *Deslauriers*, 91 R. I. 269, with respect to uncontradicted and unimpeached evidence, has no application in the case at bar.

Under point III respondents contend in substance that any attempt to prohibit or punish them for reading the statement in question would violate their first amendment rights to free speech. They also argue that the restraining order and the subsequent adjudication violate their rights against involuntary servitude under the thirteenth amendment. In support of their position they cite certain statements in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 at p. 269, and *Thomas* v. *Collins*, 323 U. S. 516 at pp. 530 and 537. We agree with the language cited, but it is not applicable to the facts of the case at bar.

In this state the law is settled that a strike by public school teachers is illegal and subject to injunction. *City of Pawtucket* v. *Pawtucket Teachers' Alliance*, 87 R. I. 364. On the evidence and the inferences which the trial justice drew therefrom, he found that the reading of the statement in question by the individual respondents at the March 24, 1965 meeting was in fact concerted action calculated to influence the members present to remain away from their classrooms and that it did result in such action being taken by the teachers on the following day. Moreover, in his decision he expressly noted that to term the action of the respondents in reading such statement as "individual" action would be contrary to every definition of concerted action.

In view of the trial justice's findings we are unable to

say that there has been any violation of respondents' first amendment rights. The restraining order did not purport in any way to limit or regulate or prohibit their right to speak or to assemble. The adjudication by the trial justice that they were guilty of civil contempt was based on his finding that the reading of the statement by the six respondents was concerted action which was calculated to, and in fact did, effect an illegal work stoppage. See *United States* v. *United Mine Workers of America, supra.* As the court so aptly said in another case involving a labor dispute, "This is not the sort of freedom of speech which is guaranteed and protected."

We find no merit in respondents' thirteenth amendment claims. The restraining order restrained the concerted action of respondents but did not in any way impose on any individual an obligation to work against his will. See *City of Pawtucket* v. *Pawtucket Teachers' Alliance, supra,* at p. 373.

We consider now respondents' contentions under point IV of their brief. They point out that they were found "guilty of civil contempt" and "not guilty of criminal contempt." They argue that the suspended fines imposed by the trial justice were penal in nature and therefore unlawful. They rely on certain language used by this court in *Nelson* v. *Progressive Realty Corp.,* 81 R. I. 445, where the court said at page 448:

> "In the circumstances of this cause we deem it unnecessary to discuss at length the law of contempt. Although the line of demarcation between criminal and civil contempt is not always clear, yet subject to constitutional requirements or statutory provisions the court has the power, in furtherance of the due administration of justice, to punish in a summary but reasonable manner any intentional act in defiance or disregard of its authority or in disobedience of its orders and decrees. In other words, generally speaking a criminal contempt involves an act solely against the au-

thority and dignity of the court itself or of a judge acting judicially, while a civil contempt ordinarily consists in intentionally disobeying an order of the court for the benefit of an opposing party in a civil action. In some instances the contempt may partake of both criminal and civil aspects. * * * Tested by the above principles, we are of the opinion that we are here dealing with a civil contempt, namely, a summary proceeding instituted by complainants for the purpose of obtaining compensation for whatever loss they suffered as a result of respondent's improper conduct."

See also page 450, where the court said:

"In considering this aspect of the case, it is important to bear in mind that in criminal contempt the sentence is punitive in order to vindicate the dignity or authority of the court itself in the interests of the public, while in a civil contempt, as here, the punishment is remedial and designed to reimburse complainants for the wrong done as a result of the noncompliance with a valid order of the court. *Ex parte Grossman*, 267 U. S. 87, 111; *Root* v. *MacDonald*, 260 Mass. 344, and cases therein cited."

We agree with the general statements of the court in *Nelson*, but point out that the tests there are not the only ones in distinguishing between civil and criminal contempt. Moreover, because of the material factual differences between that case and the case at bar, the tests discussed in *Nelson* cannot be applied here. *Nelson* involved a controversy between private parties where complainant claimed money damages. The complainant in the case at bar is a public body and there is no claim for money damages.

We believe that the rule of law stated by the court in *United States* v. *United Mine Workers of America, supra,* at p. 303, is applicable to the facts of this case. In that case the court said:

"The trial court also properly found the defendants guilty of civil contempt. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce

the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *Gompers* v. *Bucks Stove & Range Co., supra,* at 448, 449. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.

"But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

"It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant."

In his decision the trial justice found as a fact that there was no deliberate intention by respondents to flout the dignity of the court, but, as already noted, he found them guilty of civil contempt in failing to abide by the court's restraining order. He expressly stated that he found it necessary to impose a penalty which was not punitive in nature, but coercive in that it should assure compliance by respondents with the outstanding restraining order and with any orders issued in this litigation until they are modified or terminated by a court of competent jurisdiction.

In our judgment the decree on this issue is sound in law and is supported by the rationale of the court in *United States* v. *United Mine Workers of America, supra.* The fines were imposed for the purpose of coercing compliance with the court's order and meet the test only recently restated by the court in *Shillitani* v. *United States,* 384 U. S. 364, 86 S. Ct. 1531, 16 L. ed. 2d 622, the rationale of which

we find persuasive. Specifically the court noted in *Shillitani* that it was the character and purpose of the punishment rather than the fact of the same which distinguished civil from criminal contempt. The court went on to say that if the purpose is to coerce future behavior rather than to punish, the order relates to civil contempt. The court then said:

> "When the petitioners carry 'the keys of their prison in their own pockets,' * * * the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.' * * * In short, if the petitioners had chosen to obey the order they would not have faced jail."

Stated more dramatically an action is civil when a contemnor can obtain a release from a sentence by compliance with a judicial decree. In the case at bar compliance with the restraining order released respondents from the effects of the suspended fine. Under *United States* v. *United Mine Workers of America* and *Shillitani,* both *supra,* the action as well as the fine was civil in nature. The respondents' remaining contentions under point IV are without merit.

The respondents' contentions under point V are without merit. It is true, as they argue, that the teachers had returned to their duties on April 7, 1965 in compliance with the trial justice's conditional offer of assisting in the negotiations if respondents used their best efforts to have the teachers return to their duties. But it does not follow that by such action they purged themselves of contempt. Indeed, it appears from the record that this arrangement was very tenuous and there was no admission by any respondent that the restraining order had been violated; nor was any apology offered to the court. They cooperated with the court in attempting to find a solution to the controversy and it appears from the record that he con-

sidered this in his ultimate finding of guilt of civil contempt and in imposing the suspended fines.

We have carefully considered the contentions briefed by respondents under point VI. We are unable to agree with their arguments that the trial justice misconceived material evidence or that his findings were not supported by clear and convincing evidence. In our opinion complainant has sustained its burden of proof. *Nelson* v. *Progressive Realty Corp.*, 81 R. I. 445, 450.

The respondents further contend that the trial justice erred because he failed to consider any evidence offered by them to show that complainants had not come into court with clean hands. Specifically respondents attempted to show that individual members of the school committee had engaged in actions tending to provoke the teachers in their dealings with their bargaining representative so as to ultimately destroy the alliance.

Assuming arguendo that members of the school committee were guilty of the malfeasance charged by respondents, it does not follow that the doctrine of "unclean hands" is applicable to the facts of this case which involve a controversy between respondents and the school committee as an agency of the state government. *City of Pawtucket* v. *Pawtucket Teachers' Alliance, supra,* at page 371. This is not a controversy between respondents and the members of the school committee as individuals. The alleged improper action of the school committee members is not pertinent on the issue whether there has been a violation of the court's order. In any event, the doctrine of unclean hands "becomes operative only when a complainant must depend on his own improper conduct to establish his rights against the *other parties to the suit.*" *Cirillo* v. *Cirillo,* 77 R. I. 223, 226. In the case at bar complainant does not rely on its improper conduct to establish its right to have the court's order enforced.

In light of what we have said in discussing point VI, the respondents' seventh point wherein they challenge the correctness of certain evidentiary rulings needs no extended treatment. The trial justice sustained the complainant's objection to certain questions, during cross-examination, purporting to establish that the complainant was not in court with clean hands. The respondents claim that the questions also sought to test the credibility of the complainant. After considering the challenged rulings in the context of the entire transcript we are unable to say that they constituted prejudicial error.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Higgins, Cavanagh & Cooney, Joseph V. Cavanagh,* for complainant.

*Abedon, Michaelson, Stanzler & Biener, Milton Stanzler, Richard A. Skolnik,* for respondents.