Jesuino RODRIQUES and Maria
Rodriques

v.

Alfredo SANTOS and Manuel Cabral.

No. 82–438–Appeal.

Supreme Court of Rhode Island.

Oct. 7, 1983.

Leonard Decof, Mercedes Deines, Decof & Grimm, Providence, for plaintiffs.

Stephen J. Fortunato, Jr., McKinnon & Fortunato, Pawtucket, for defendants.

## OPINION

SHEA, Justice.

The defendants, Alfredo Santos and Manuel Cabral, appeal from a judgment entered against them in the Superior Court. The appeal raises several issues, that will be addressed in the order presented. We affirm the judgment entered below.

The evidence established that the plaintiff, Jesuino Rodriques, was seventy-six at the time of trial. He was born in Brazil and was taken to Portugal when he was very young. By the time he emigrated to the United States in 1920, he had only completed four years of schooling. He never learned to read or write English but could sign his name. The plaintiff's wife, Maria, was born in Portugal. She could neither read nor write in any language and never attended school.

Since the 1920s plaintiffs had enjoyed a very close friendship with defendant Santos. At one time, when plaintiffs were in Portugal for a year, Alda, their daughter, lived in the Santos home. Alda testified that Emily Santos Cabral, daughter of defendant Alfredo Santos, was her godmother at her confirmation. The defendant Cabral, Santos's son-in-law, became acquainted with plaintiffs around 1942.

The controversy in this case involves money that plaintiffs lent at the request of defendants. Santos and a cousin had established a dump-truck business known as A. Ancelmo Trucking Company, Inc. The company later extended its operations to include tractor-trailers for use in hauling freight. Sometime later the business was converted back to its original operation. In 1948 defendants approached plaintiffs and asked them to invest money in a Massachusetts corporation known as the Boston-New

York Transportation Company (Boston-New York), which was being purchased by Santos, Cabral, and others. The plaintiffs agreed to invest $22,000 in the corporation; however, there is no evidence that they ever received any stock certificates in return for their capital investment.

About a year later defendants again approached plaintiffs, requesting an additional $20,000 for Boston-New York, which by then was in serious financial difficulty. Although plaintiffs initially were very reluctant to invest more money, they eventually yielded to the beseeching of defendants but attached certain conditions to this loan. The trial justice found that plaintiffs agreed to lend an additional $18,000 to defendants in the form of a personal loan. In return, defendants agreed to convert $12,-000 of the original $22,000 capital investment into a personal loan. As a result, defendants were personally liable for loans in the aggregate of $30,000. The parties further agreed, as found by the trial justice, that the new loan would be secured by personal notes and mortgages on real estate owned by defendants. The trial justice also found that plaintiffs understood and expected that defendants would repay them personally and that plaintiffs agreed to those terms.

Over the following years, plaintiffs made numerous demands on defendants for repayment of the $30,000 loan. Throughout this period, defendants apparently recognized the obligation they had toward plaintiffs. There was testimony given by plaintiffs' daughter, Alda, which the trial justice found credible. She was a college graduate, was fluent in the Portugese language, and had participated in and heard many discussions relating to the transaction from its earliest days. She testified that at various times as late as 1959 defendants promised to repay the loan, and these promises were repeated into the early 1960s.

Although defendants had initially promised to secure the loans with mortgages on their personal real estate, they instead drew up two $15,000 mortgages on the corporate property—one on property of Boston-New York and the other on property of A. Ancelmo Trucking Co., Inc. The plaintiffs received no mortgage notes or deeds.

In 1955 defendant Cabral was able to induce plaintiffs to sign discharges of the mortgages on the business properties, which discharges were recorded. At this time, the transportation company was again in financial trouble and was being sold to another Massachusetts trucking company for $125,-000 out of which creditors, including plaintiffs, were to be paid. The closing attorney, however, refused to pay plaintiffs because they did not have notes evidencing the mortgages. Instead, the attorney placed the disputed sum in escrow. A short time later when Boston-New York went into bankruptcy, the trustee brought suit to recover these escrowed funds on the ground that Boston-New York had illegally given a mortgage to secure personal loans without proper authorization. The Massachusetts court agreed, ruling the mortgages illegally made.

In February of 1958, plaintiffs consulted an attorney about security for their loans. As a result of this consultation, defendant Cabral offered to make plaintiffs beneficiaries to $30,000 of a $40,000 personal life insurance policy. This policy had originally named Ancelmo Trucking as beneficiary, but it had been taken over by Cabral personally in 1957 at which time he designated his wife and children as beneficiaries. Although he actually did substitute plaintiffs as beneficiaries for $30,000, this policy was later canceled when Cabral surrendered it for its cash value in 1961.

The record indicates that during the intervening years, the families remained friendly and continued to see each other during and after the February 1958 contact that resulted in Cabral's assignment of the proceeds of his life insurance policy. The parties to the action continued to discuss the debt, and plaintiffs forebore any legal action as a result of their continuing understanding and belief that defendants would repay the loan.

In March of 1964, plaintiffs finally realized that defendants apparently did not intend to repay the $30,000 personal loan and filed suit through their original attorney. This action began as a bill in equity under our common-law practice followed before the adoption of the Rules of Civil Procedure in 1966. In the bill of complaint, plaintiffs sought that a lien be placed upon the estate and assets of defendants in such sum as would be found due; that defendants be restrained and enjoined from conveying, transferring, alienating, or encumbering their property to evade or avoid the effects of any findings made against them; and that plaintiffs be awarded such other and further relief as justice and equity might require.

When the action was first filed, the attorney for defendants only entered an appearance. Under the old practice, this appearance constituted a plea to the general issue and therefore the case was considered answered even though a formal answer was not actually filed for almost twelve years. The action lay dormant until 1975 when plaintiffs engaged new counsel who moved to assign the case for trial and noticed depositions of defendants. The defendants' attorney then filed a motion to dismiss under Rule 41(b)(2) of the Superior Court Rules of Civil Procedure, which was denied. He proceeded to file an answer asserting a general denial of plaintiffs' allegations and also raised affirmative defenses of statute of limitations, laches, and plaintiffs' failure to prosecute. The matter was reached for trial before a justice of the Superior Court sitting without a jury in 1979. A decision was rendered for plaintiffs, and judgment was entered in June of 1982.

The defendants raise before us the defense of statute of limitations, which, during the time in question, was six years.[1] The evidence established that the original $22,000 transaction took place in 1948 and that approximately a year later the additional $18,000 changed hands. The defendants assert that the loans were made to Boston-New York and were payable immediately upon demand, which would mean that the statute of limitations ran within six years of the loans. There was evidence, however, which the trial justice found credible, that defendants acknowledged the debt as personal rather than corporate; that these acknowledgments continued well into the 1960s; and that defendants at various times promised to pay or expressed a willingness to repay the $30,000 that plaintiffs claimed at all times to be defendants' personal obligation. It is uncontroverted that defendant Cabral designated plaintiffs as beneficiaries to $30,000 of his life insurance proceeds in response to the continued demands for payment. This transaction, which occurred at a time when plaintiffs were represented by counsel, was referred to specifically by the trial justice as a further acknowledgment of the debt. This arrangement involving the insurance proceeds remained in effect until 1961 when Cabral turned the policy in for its cash value. After reviewing all of the evidence, the trial justice found that defendants had not met their burden of proving the affirmative defense of statute of limitations. Before us, defendants claim error.

On appeal we do not consider arguments that certain evidence is more credible than other evidence. That is a function of the trial court. *J. Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corp.*, 120 R.I. 360, 364, 387 A.2d 694, 696–97 (1978). The testimony was in conflict, and the trial justice believed the evidence presented by plaintiffs. Findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed on appeal unless they are clearly wrong or unless the justice misconceived or overlooked material evidence. *Ferris v. Hawkins*, R.I., 457 A.2d 253, 255 (1983); *Altieri v. Dolan*, R.I., 423 A.2d 482, 484 (1980).

The reliance that defendants place on *Di-Battista v. Butera*, 104 R.I. 465, 244 A.2d

---

1. General Laws 1956 § 9–1–16, repealed by P.L.1965, ch. 55, § 7. The six year statute of limitations is now codified as G.L.1956 (1969 Reenactment) § 9–1–13.

**310**

857 (1968), is misplaced. In that case this court held that a promissory demand note was payable immediately and the statute of limitations would begin to run when it was made unless the note itself or circumstances showed otherwise. The critical difference between the facts in that case and the one before us is that in *DiBattista* there was a promissory demand note. No such instrument was ever delivered to plaintiffs in this case, and the record is replete with acknowledgments of the debt for years after the loans were made.

The trial justice specifically ruled on the statute-of-limitations defense when he denied the motion for a directed verdict. A motion for directed verdict in a jury-waived case is not appropriate. The motion should be a motion to dismiss. The trial justice, however, considered the motion for direction and applied the criteria applicable to such a motion rather than consider it a motion to dismiss.

In ruling on the motion, the trial justice discussed the evidence before him. He particularly referred to the designation by Cabral of the proceeds of his life insurance policy as one of several continuing acknowledgments by defendants of their obligation to repay the loan. This arrangement and the other acknowledgments by defendants were found to be sufficient to take the case out of the statute of limitations. Our own review of the record leads us to the conclusion that there was adequate evidence to support the trial justice's finding that there was a continuing acknowledgment that defendants were obligated to repay the $30,000 as a personal loan and that, therefore, the statute-of-limitations defense was without merit.

The defendants argue that this issue was not addressed by the trial justice in his written decision as required by Super.R. Civ.P. 52(a). The defendants made the motion for a directed verdict at the end of plaintiffs' case. It was argued and ruled on at that time and was renewed but not argued at the end of all the evidence. It would have been preferable for the trial justice to restate his findings on the statute-of-limitation defense in his written decision. However, his conclusions on that issue, although oral, were fully transcribed and are available in the record for our review. In ruling on the application of Rule 52, this court has held that because the expeditious disposition of cases is obviously preferable to an insistence on rigid formalism, we have adopted the view of the Federal Courts and do not in every instance insist upon strict compliance with the fact-finding requirements of Rule 52(a). *Rowell v. Kaplan*, 103 R.I. 60, 70, 235 A.2d 91, 97 (1967). We have concluded that the trial justice was correct in denying the motion.

The defendants next argue that the trial justice abused his discretion when he overruled their motion to dismiss under Rule 41(b)(2) for lack of prosecution and also under G.L.1956 (1969 Reenactment) § 9-8-3. One of the provisions of Rule 41(b)(2) permits the Superior Court, in its discretion, on motion of the defendant, to dismiss any action for the plaintiff's failure to prosecute. Section 9-8-3 permits all courts, in their discretion, to dismiss any action or proceeding for lack of prosecution which has been pending for five years or more. In his decision, the trial justice discussed at length the cases relied on by defendants, each of which involved an appeal from the granting rather than denial of a motion to dismiss.[2] He distinguished each from the case before us principally on the evidence presented in those cases in support of the motion to dismiss. In each of those cases, actual prejudice was demonstrated. In one case, there was a critical witness who had died; in another there was the death of a party; in the last case, a witness at trial had difficulty remembering necessary facts. In each of the cited cases,

---

**2.** *Manton Industries, Inc. v. Providence Washington Indemnity Co.*, 113 R.I. 198, 319 A.2d 355 (1974); *Bell v. Thomas*, 109 A.2d 580 (D.C. 1954); *Hruska v. Gibson*, 316 Pa. 518, 175 A. 514 (1934).

it was clear that the trial court would have serious difficulty coming to a just and reliable result. The trial justice found that none of those factors existed here. All of the parties and key witnesses were available. There was ample evidence corroborated by the testimony of disinterested persons to render a sound and equitable decision. On the basis of the lack of any actual prejudice and in view of the fact that all of the parties and important witnesses testified and their memories were acute, the trial justice exercised his discretion in favor of a hearing on the merits. On the basis of the record before us, we cannot say he abused his discretion in any way.

The defendants also raised the issue of laches and argue that this case should have been dismissed on that ground. Laches is negligence to assert a known right, seasonably coupled with prejudice to an adverse party. *Lombardi v. Lombardi,* 90 R.I. 205, 209, 156 A.2d 911, 913 (1959). Both elements, delay and prejudice, must be shown. *Fitzgerald v. O'Connell,* 120 R.I. 240, 386 A.2d 1384 (1978). Very recently this court had occasion to reaffirm the principle that time lapse alone does not constitute laches. Rather, when unexplained and inexcusable delay cause prejudice to the other party, the defense of laches may be successfully invoked. *Hyszko v. Barbour,* R.I., 448 A.2d 723 (1982). In both *Hyszko* and *Manton Industries, Inc. v. Providence Washington Indemnity Co.,* 113 R.I. 198, 319 A.2d 355 (1974), there was actual prejudice in that parties had died and witnesses had been lost. In the absence of a showing of any actual prejudice in this case, dismissal on the basis of laches was not warranted. We cannot say that opting for a trial on the merits in this case was either error or an abuse of discretion.

Next, defendants argue that Jesuino's false testimony in Massachusetts must prevent recovery here, that one who comes into a court of equity must come with "clean hands." "The court will not lend its aid to one guilty of fraud." *Silva v. Merritt, Chapman & Scott Corp.,* 52 R.I. 30, 33, 156 A. 512, 514 (1931). The unclean-hands doctrine is of no assistance to defendants in this case.

"[T]his [doctrine of 'unclean hands'] is not a license to destroy the rights of persons whose conduct is unethical. The rule is that unrelated bad conduct is not to be considered against the plaintiff. It is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct. 'What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts.'" Dobbs, *Handbook on the Law of Remedies* 46 (1973) (citing *Republic Molding Corporation v. B.W. Photo Utilities,* 319 F.2d 347 (9th Cir.1963)).

This court has held that the doctrine of unclean hands " 'becomes operative only when a complainant must depend on his own improper conduct to establish his rights against the *other parties to the suit.*'" *School Committee of Pawtucket v. Pawtucket Teachers Alliance, Local No. 930,* 101 R.I. 243, 257, 221 A.2d 806, 815 (1966). The plaintiff's testimony in the Superior Court in Massachusetts did not create his claim against defendants. That testimony was entirely collateral to his claim that defendants agreed that $30,000 of the money advanced was to be a personal debt owed by defendants. The trial justice found that defendant Cabral had induced plaintiff to make the misrepresentation to the Massachusetts court. In ruling on a motion for directed verdict, the trial justice found that plaintiff did not understand what the Massachusetts Superior Court proceeding was, did not understand the oath and some of the questions, found that plaintiff trusted and relied on Cabral, found that Cabral had told plaintiff what to say, and found that plaintiff believed it was neces-

sary for him to do what he did to get his money back.

*Silva v. Merritt, Chapman & Scott Corp., supra,* does not support defendants' position. In that case, the petitioner was attempting to establish herself as the common-law wife of a man fatally injured at work. She was found to have obtained a divorce from her legal husband through misrepresentation to the court. Since she had removed the impediment to her common-law marriage by fraud, she was barred from establishing herself as the widow entitled to survivor's benefits. The plaintiff in this case is not in a similar situation. In fact, in this case, since defendants induced the false testimony of plaintiff, they should not be allowed to benefit from it in this proceeding.

The defendants also argue that the trial justice misconceived and overlooked material evidence when he resolved the issue of credibility in favor of plaintiffs. There was evidence in the record which established that plaintiffs were able to achieve considerable success in their business affairs in spite of their lack of formal education and their inability to read or write English. The plaintiffs operated liquor stores successfully, and they were able to function adequately in their business dealings. They were familiar with the purchase and sale of businesses and with the investing and lending of money and were obviously able to fix reasonable and favorable considerations for the security of their money. It is apparent that they were individuals of considerable means because the sums of money they were able to lend were substantial at the time of these transactions. Nevertheless, it is also clear from the record that defendants, and particularly Cabral, were more widely experienced and better educated than were plaintiffs. The trial justice found that plaintiffs' evidence was credible, which evidence established that plaintiffs acceded to defendants exhortations on the understanding that the loans would be personal rather than corporate, and that defendants had promised again and again to

repay the loans and had misled plaintiff into testifying falsely, because he believed that it was necessary for him to do so in order to get his money back.

■■■■ It is well settled that ordinarily the findings of a trial justice on credibility are conclusive unless an examination of the record discloses that he has misconceived or misinterpreted important evidence or that he was mistaken in his judgment of the witness. *Star Dinette & Appliance Co. v. Savran,* 104 R.I. 665, 666, 248 A.2d 69, 70 (1968). The question of who is to be believed is one for the trier of fact. We do not, on appeal, consider what evidence should have been accepted and what should have been rejected. *J. Koury Steel Erectors, Inc. of Massachusetts v. San-Vel Concrete Corp.,* 120 R.I. at 364, 387 A.2d at 697. The trial justice was acting within his discretion in deciding which testimony to accept. Our reading of the record persuades us that there is no merit in this argument.

Finally, defendants argue that the principles of res judicata and collateral estoppel are a bar to this action. They assert that the Massachusetts Superior Court adjudication in which plaintiff, Jesuino Rodriques, was one of the named defendants and in which he testified, determined the issues in this case. There are several problems with this argument.

■■■■ Collateral estoppel and res judicata are affirmative defenses, and as such, they must be affirmatively pleaded in the answer or raised by a proper motion, or they are waived. Super.R.Civ.P. 8(c) and 12(h). *See Kelly v. C.H. Sprague & Sons Co.,* R.I., 455 A.2d 1302, 1305 (1983); *Associated Bonded Construction Co. v. Griffin Corp.,* R.I., 438 A.2d 1088, 1091 (1981). The defendants did not raise either of these issues in the trial court and therefore may not raise them for the first time on appeal. Aside from that fact, neither doctrine applies here. Res judicata and collateral estoppel require that the issue in question be

finally determined in the prior proceeding. The issue resolved in the Massachusetts case was the validity of mortgages issued without proper authority by the bankrupt corporation. The mortgages were held to be invalid. The plaintiffs' claims against the defendants in this case were in no way litigated and decided in that proceeding. Consequently, neither res judicata nor collateral estoppel could have benefited the defendants in this case if either had been properly pleaded.

For the reasons stated, the defendants' appeal is denied and dismissed, the judgment entered below is affirmed, and the papers of this case are remanded to the Superior Court for further proceedings.

MURRAY, J., did not participate.