DECISION
This matter is before the Court for decision following a trial without the intervention of a jury. The Court has toured the property in controversy with the litigants and their attorneys. The Plaintiffs, William A. Hilley and Toni Lynn Hilley ("the Hilleys"), seek a declaration from this Court that the Defendant, Stephen T. Lawrence ("Lawrence"), has no entitlement to use and/or improve a certain access and right of way passing over their property to Lawrence's land. Lawrence maintains that his right to said access is reserved in the parties' predecessor deeds, and further asserts, in the alternative, that such a right was created by adverse possession and/or an easement by implication, acquiescence or necessity.
 Facts and Travel
The Hilleys purchased the land in question, identified as Lots 26 and 3 on Block 53 of the Tiverton Tax Assessor's Map, on September 15, 1983. On May 19, 1998, Lawrence purchased his land, identified as Lot 2[1]
on Block 52 of the aforementioned map, from the estate of Frances H. Shea.[2] Mrs. Shea's husband, Matthew A. Shea, had *Page 2 
predeceased her in 1992. Both the Hilleys' and Lawrence's parcels were created by a subdivision, and are designated and identified in the recorded "Sunderland Plan" dated June 29, 1942. The plan provides for vehicle access from Riverside Drive first proceeding uphill easterly, then turning sharply north into Barker Heights.[3]
Plaintiff William A. Hilley III, who has resided at 269 Riverside Drive (the west or shore side of the drive) since January 1970, testified that he acquired the "east side" lots — 26 and 3 — in 1983. The Hilleys enjoyed an excellent relationship with the Sheas, "one marked by friendliness, mutual respect, and integrity." It is, therefore, no surprise that when the Hilleys purchased their land in 1983, they accorded the Sheas carte blanche to drive over the Hilleys' land and park on the land presently owned by Lawrence. The only access to the property was a flight of concrete and wooden steps built into an embankment going directly from Riverside Drive to the lot. The steps are still existent, in part, but in a decayed condition. The lot itself was unimproved at the time the Hilleys freely authorized the Sheas (who were using the parcel as a storage area) to cross the Hilley land "at any time."
Within a year of Lawrence's acquisition of his lot, Mr. Hilley observed Lawrence's tenants parking cars on his (Hilley's) land and wearing ruts into it, causing him concern as to the presence of the cars and the erosion of his land. Mr. Hilley's concerns were understandably heightened in August 2001 when he observed Lawrence accompanied by surveyors on the Hilleys' property. Mr. Hilley then approached Lawrence and told him that the "college girls" were damaging his (Hilley's) lot and reminded him (Lawrence) that he never requested the Hilleys' permission for access. Hilley also suggested that the parties consult attorneys regarding the issue of access. *Page 3 
Subsequently, Hilley proposed purchasing the Lawrence lot, but Lawrence "did not answer one way or the other" and stated that he "had to look out for his future."
Hilley then decided to engage a registered land surveyor and on the strength of the resulting survey depicting the disputed area as Hilley-owned, Hilley erected a fence in November 2001. This event was not referenced by Lawrence until April 2002 when he inquired of the Hilleys as to the reason for the fence installation. Mr. Hilley replied that he "needed to protect [his] property," as he was familiar with the theory of adverse possession, and produced the survey and the surveyor's telephone number to Lawrence.
In mid-July 2003, the Hilleys embarked on a camping trip to the Arcadia Management area in Hope Valley. When they returned to their home on July 19, they were shocked to observe that a portion of the fence enclosing their property had been torn down. As Mrs. Hilley testified, "our mouths hung open" as she and her husband observed Lawrence in the cobblestone driveway he had installed during their absence. Sadly, much of the country garden Mrs. Hilley created and lovingly tended had been destroyed. In its place were large unsightly concrete planters, all in rectangular form, but for one in the likeness of a pelican. SeeEx.35. The Hilleys called the police and the responding officer informed them that the situation was for civil, not criminal, resolution.
 Standard of Review
In a non-jury trial, "the justice sits as trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, she [or he] weighs and considers the evidence, passes upon credibility of the witnesses, and draws proper inferences." Id. "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." Walton v. Baird,433 A.2d 963, *Page 4 
964 (R.I. 1981). "It is also the province of the trial justice to draw inferences from the testimony of witnesses. . . ." Id.; see alsoRodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983).
"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon. . . ." See Super. Ct. R. Civ. P. Rule 52. The Rhode Island Supreme Court has held that in order to comply with this rule, the trial justice need not engage in extensive analysis and discussion. Eagle Elec. Co. v. Raymond ConstructionCo., 420 A.2d 60, 64-65 (R.I. 1980). Strict compliance with the requirements of Rule 52 is not required if a full understanding of the issues may be reached without the aid of separate findings.Id. at 64. Even brief findings and conclusions are sufficient as long as they address and resolve pertinent, controlling factual and legal issues. White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983).
 Law and Analysis
Lawrence's first contention is that the Hilleys' source deeds (Ex. 1-5):
 "created and preserved clearly defined easements and rights of way for . . . [his] benefit. . . . A fair reading of all deeds in the Lawrence chain of title commencing with the Deed of George and Catherine Sunderland in August 1942 (Book 71, Pages 296-7) provided the right to use and access Sunderland Road."
See Def.'s Mem. at 7. The latter deed (Ex. 6) from the Sunderlands to James P. and Elizabeth Galligan includes a conveyance of:
 "[t]hat portion of the above described premises which lies within the boundary lines of a drive shown upon a plan entitled `Plan of Property in Tiverton, R.I. surveyed for George S. and Catherine B. Sunderland, June 29 1942, H.J. Harvey, C.E.' is subject to a right of way over, under and *Page 5 
across the same for all purposes, extending from the boundary line of Barker Heights, so-called, southerly and westerly to the Town or Public highway, which said way shall remain open and unobstructed forever for the benefit of the grantors, their heirs and assigns, and the owners of all other land shown upon said plan, their heirs and assigns. Hereby granting to the grantees herein a right of way for all purposes over, under and across said drive, extending from the boundary line of Barker Heights, so-called, southerly and westerly to the Town or Public highway."
In the Court's opinion, the boundary lines of Sunderland Drive are clearly demarcated on the 1942 sub-division plan. See Ex. 11. Surveyor Richard Lipsitz testified that the deed language references to boundary lines "confused" him because the lines depicted on the plan are "dashed" rather than "solid." Surveyor Joseph A. Marrier characterized the dashed lines as an "approximation" of the location of the intended drive. Both surveyors acknowledged that the dashed lines transect the driveway frontage of every lot except for Lots 6 and 7. The dashed line running parallel to the northern border of Lawrence's lot does not even touch the parcel. The configuration depicted on Exhibit 11, in the context of other credible evidence presented, clearly intends to indicate that access to Lots 6 and 7 is to be accomplished from Riverside Drive. This interpretation is consistent with the installation of the stairway constructed from Riverside Drive up the incline to Lot 6. Both surveyors testified the installation of a driveway from Riverside Drive is feasible, but a more costly project than Lawrence's claimed driveway over the Hilleys' land. In any event, the Court is convinced by the aforementioned evidence that the source deeds and attendant plans confer no right upon *Page 6 
Lawrence and, therefore, judgment on this count of his counterclaim shall enter for the Hilleys.[4]
Lawrence's next contention is that he and his predecessors in title have acquired an easement by prescription over the portion of the Hilleys' land in dispute. A proponent of such a claim must establish by "clear and satisfactory evidence" an "actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years."Allaire v. Fease, 824 A.2d 454, 457 (R.I. 2003) (citing Stone v. GreenHill Civic Association, Inc., 786 A.2d 387, 389 (R.I. 2001)).
The uncontradicted, credible testimony of William A. Hilley III was that permission to cross his land had been extended solely to the members of the Shea family, commencing in 1983. After Matthew Shea passed away in December 1992, his widow, Frances Shea, "very seldom, if ever, parked on the Hilley land" and "generally parked on Riverside Drive." Frances deceased in 1997 and Lawrence purchased the lot the following year. In 2001, the Hilleys clearly expressed their proprietary and exclusive rights to the disputed land by erecting the fence which spawned this litigation. Several independent witnesses who were familiar with the neighborhood involved in this controversy corroborated the Hilleys' testimony that only Shea family members parked on the disputed area and only with the express permission of the Hilleys to cross.
Edmund Proulx, who lived 285 Riverside Drive from 1968 to 2001, testified that as a schoolboy he traversed the area of the Lawrence "driveway" several times a day. He explained that there had never been a "shell" driveway there, rather only a two foot path created by youngsters cutting through the parcel to get to school or to play. Mr. Proulx *Page 7 
also noted that the children did not ask anyone for permission to cut through the parcel because they did not know whom to ask. As he stated, "I thought I owned the place . . . it was my own corner of the world." Moreover, the Mitchells, who owned Lot 6 from 1947 to 1972, parked their car in a garage on Riverside Drive and not on the lot proper.
Hannah Sullivan, who resided seasonally in Barker Heights, first observed the disputed area when she started school at the Dominican Academy in 1945. She passed by the now cobblestone driveway several times per week until she finished high school in 1958. Although she spent her college years at the Dominican Sisters Novitiate in Columbus, Ohio, she continued to summer in Barker Heights until at least 1977 when she purchased a boat with her brother, Mark. Ms. Sullivan testified that she never noticed any vehicles parked in the now cobblestone area nor did she ever see a "shell" driveway maintained there. The only time she had occasion to observe a car on the spot is when a courteous motorist would temporarily pull over to allow an approaching vehicle to pass.
Mrs. Priscilla Poirier, a science teacher, described that her first memory of the area dated back to the early 1960s when she was twelve years old. She walked on the "right of way" (Sunderland Drive) several times a day to go to the Tiverton Yacht Club. In 1965, Mrs. Poirier left Rhode Island to attend Boston University, but continued to summer in Rhode Island during her college years. She testified that she never saw a driveway on the lot until Lawrence installed one in 2003. She specifically recalled that the Sheas parked their car in front of their home on Riverside Drive. Mrs. Poirier also remembered the path described by Mr. Proulx and explained that she did not travel upon it because her father "would not let [her] go." *Page 8 
The only testimony somewhat at variance with that of the aforementioned three witnesses was furnished by Robert Dixon. Mr. Dixon did recall a shell driveway in the approximate place presently occupied by the cobblestone driveway; however, he noted that the cobblestone driveway is "much bigger." Mr. Dixon lived year round at 273 Riverside Drive with his grandmother, grandfather, and aunt until 1953 when he was in the third grade. He then moved to the Riverside section of East Providence to complete elementary school and to attend high school. From 1953 to 1963, he visited his grandparents on a weekly basis in the winter and on weekends during the summer. From 1963 to 1969, when he no longer had any familial connection to the area, Mr. Dixon was only in the area four times per year. In 1969, he was residing in Little Compton and by January 1970, he left for Hawaii to perform two years of active duty with the Coast Guard with which he had a twenty-one year career.
Because of these circumstances and in the context of an abundance of convincing and corroborative evidence, the Court is obliged to attribute far greater weight to the testimony of the three independent witnesses (Proulx, Poirier, and Dixon) who have no stake in this litigation. An evaluation of the pertinent, credible evidence compels this Court to conclude that Lawrence has failed to sustain his burden of proving the existence of easement by prescription, i.e. actual, open, notorious, hostile and continuous use of the easement under the claim of right for ten years. The aforementioned testimony similarly defeats Lawrence's claim of entitlement to an easement by acquiescence.
Lawrence's final, and alternative, theories of recovery are that he has established an easement by necessity or implication over the Hilleys' parcel. In assessing "necessity," the Court must inquire whether, as a question of fact, an easement is *Page 9 
"reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made." Nunes v.Meadowbrook Dev. Co., 824 A.2d 421, 425 (R.I. 2003) (citing Wiesel v.Smira, 49 R.I. 246, 250, 142 A. 148, 150 (1928)). The Court must also determine whether "a substitute could be procured without unreasonable trouble or expense." Id.
Lawrence's own expert, Richard Lipsitz, testified clearly that it was feasible to create a driveway from Riverside Drive to the Lawrence lot, but that the required excavation and the potential need for a retaining wall would make the installation more expensive than installation on a flat surface. Furthermore, pursuant to a stipulation Lawrence entered with the town's Zoning Board of Review, he is mandated to provide vehicular access to his lot from Riverside Drive. The mere suggestion that the creation of such access is "more expensive" by some unspecified sum is inadequate to sustain the requisite finding of "necessity." Therefore, recovery on this theory is denied.
Lastly, in his second alternative theory of recovery, Lawrence requests the Court "to judicially create" an implied easement. In the absence of a written easement, the Supreme Court directs this Court to discern the intent of the parties at the time of the conveyance considering all of the facts and circumstances existing at the time of the deed's execution. See Catalano v. Woodward, 617 A.2d 1363, 1366
(R.I. 1992) (citing Sullivan Granite Co. v. Vuono, 48 R.I. 292, 294-95,137 A. 687, 688 (1927)). This Court has already determined, based on the evidence, that an easement is not "reasonably necessary" for the convenient and comfortable enjoyment of the Lawrence land. Compellingly, there is a dearth of evidence to support the conclusion that Sunderland and Galligan intended a reserved easement to exist. As the Hilleys point out in their post-trial *Page 10 
memorandum, there is "considerable evidence that Sunderland did not intend any such easement. The lack of evidence that Galligan or any of his successors in title to the Lawrence land fortifies this position."Pls.' Mem. at 17-18.
After a comprehensive review and evaluation of evidence presented, and the attribution of weight to same, the Court orders that judgment be entered in favor of the Hilleys as Plaintiffs in the underlying suit and as Defendants in the counterclaim. The Court declines, however, to award compensatory damages to the Hilleys due to the insufficient particularity of the evidence on this point. Mrs. Hilley did present an estimate from the "Well Kept Gardens" shop (Ex. 29) assigning a replacement value to each of the various lost plantings. She candidly stated, however, that in her mind "the monetary figure was high." Mrs. Hilley testified that the garden shop had used a catalog because "they couldn't run around like [her] . . . and hunt down bargains." As the Court cannot speculate what sum would represent fair and reasonable compensation, it must forego a damage award.
Counsel for the Hilleys shall prepare an order conforming to the rulings in this decision.
[1] On the "Sunderland Plan" Lot 2 is depicted as Lot 6. See Ex.11.
[2] The Hilleys and Lawrence also own residences on the west side of Riverside Drive, Tiverton, but their location is immaterial to the within dispute.
[3] The Court walked the entirety of the way from Riverside Drive to Barker Heights during the view.
[4] This ruling extinguishes Lawrence's tandem arguments asserted pursuant to R.I. Gen. Laws §§ 34-13-2 and 34-11-28. *Page 1