[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This case is before the Court for decision following a non-jury trial on a complaint by DeSimone Electric (Plaintiff), seeking to enforce a mechanics' lien against Defendants CMG, Inc. (CMG) and Ashford Homes, LLC (Ashford), and to recover damages for breach of contract against Defendant James Colucci (J. Colucci). By counterclaim, Defendants seek damages against Plaintiff for breach of contract and negligence. Jurisdiction is pursuant to Superior Court Rule of Civil Procedure 39(b). Glocester, Rhode Island
 FACTS/TRAVEL
Alberto DeSimone (DeSimone) is the principal officer and sole shareholder of Plaintiff corporation, an electrical subcontractor that performs residential and light commercial electrical installations. At the time the subject controversy arose, CMG owned, developed, and served as general contractor for City View Highlands Estates (City View), which is located in Johnston, Rhode Island CMG hired Plaintiff to perform work on eight lots in City View. J. Colucci, president of CMG, also employed Plaintiff to complete electrical installations at his 87 Iroquois Trail home (87 Iroquois) in Glocester, Rhode Island
I. City View
Plaintiff began work at City View at the end of 2000 and discontinued labor on July 17, 2001. The houses at City View consist of small raised ranches, generally of similar size. Plaintiff and CMG orally agreed that Plaintiff would perform electrical work at each lot for $2,750.[1] More specifically, for this price, Plaintiff was to complete the "basic" or "rough" wiring at each lot, which included performing the following in accordance with the electrical code: (1) installation of 100 amp. overhead service to bring power into the house; (2) wiring of three bedrooms; (3) wiring of one bathroom; and (4) wiring of the kitchen with three recessed lights, plugs, and switches. Basic wiring also included wiring to supply power to the appliances (Tr. at 118) and the furnace, and the installation of one circuit breaker to provide the workers with temporary power. (Tr. at 119.) Basic wiring did not include controlled wiring.[2] (Tr. at 118-19.) Additionally, Defendants assert that Plaintiff was responsible for the payment of electrical permit fees. (Tr. at 195.)
The base price of $2,750 did not include "extras." When a homeowner requested an "extra" from CMG, CMG would notify Plaintiff, Plaintiff would provide CMG with a price, CMG would discuss the price with the homeowner, and if the homeowner agreed to the price, CMG would bill the work out as an extra and pay Plaintiff in addition to the $2,750.
To receive payment for the work it performed on the lots at City View, Plaintiff would submit an invoice upon completion of the rough phase of the electric work at the lot. CMG or Ashford would generally pay Plaintiff within one or two weeks thereafter (Tr. at 29) and never took more than two or three months to pay Plaintiff. (Tr. at 108.)
In general, electrical subcontractors such as Plaintiff are usually the third or fourth trade to work on a project, following site work, foundation, rough framing, and heat and air. (Tr. at 183.) Therefore, it is important for electrical contractors to initiate work on a project in a timely manner so that the other trades can follow suit. (Tr. at 184.)
II. 87 Iroquois
No written agreement existed concerning the work to be performed at 87 Iroquois or the price of the work. At trial, the parties presented conflicting testimony regarding their oral agreement as to price. DeSimone testified that he and J. Colucci agreed upon a not-to-exceed price of about $9,500. (Tr. at 10.) DeSimone further testified that J. Colucci agreed to pay him approximately the same amount that Ashford paid him for work he performed at another, slightly smaller home. (Tr. at 9.) James Colucci, on the other hand, testified that he agreed to pay Plaintiff $6,800. (Tr. at 169.) Thomas Patrick Colucci (T. Colucci), J. Colucci's brother, corroborated J. Colucci's testimony. (Tr. at 275.) Moreover, J. Colucci directs this Court's attention to an electrical permit application in which DeSimone estimated the completed installation's cost at $5,000. (Tr. at 151, Plaintiff's Exhibit 3C.) In response, DeSimone testified that $5,000 constituted a rough estimate; that he wrote $5,000 to save money on the permit fee (Tr. at 141); and that he filled the electrical permit application out prior to having performed a "walk-through" of the house.[3] As for supplies, DeSimone and J. Colucci agreed that J. Colucci would provide the lighting, Plaintiff would install it (Tr. at 267), and Plaintiff would credit J. Colucci $75 for each light he did not install. (Tr. at 171.)
James Colucci alleges that a plan existed for 87 Iroquois' electrical work, but that the work he requested slightly deviated from the plan. (Tr. at 169.) James Colucci and T. Colucci performed a walk-through of the house with DeSimone though J. Colucci maintains that none of 87 Iroquois' lighting was "extraordinary." (Tr. at 169.)
III. The July 19, 2001 Meeting and its Aftermath
On or about July 19, 2001, J. Colucci, T. Colucci, and Stephen Colucci met with DeSimone at Birchwood Estates, a project site. DeSimone alleges that the parties met to discuss future work Plaintiff was to perform at Birchwood Estates, while J. Colucci asserts that they met to discuss Plaintiff's completing or correcting his work at City View. (Tr. at 231.) At the meeting, DeSimone stated that he could not continue work without further payment. (Tr. at 109.) J. Colucci, in turn, informed DeSimone that there were problems with his work. An argument ensued, and Plaintiff never returned to work. (Tr. at 137.)
On July 20, 2001, CMG sent DeSimone a letter advising him that Plaintiff was behind schedule on Lots 3, 4, 5, and 7 and that CMG would hire another subcontractor if Plaintiff did not complete this work in a timely manner. (Defendants' Exhibits A, B, and C.) On the same day, Plaintiff filed notice of intention to claim liens at City View for the following amounts: $995 (Lot 3); $125 (Lot 4); $1,750 (Lot 5); $295 (Lot 7); and $1,925 (Lot 8). (Plaintiff's Exhibit A.) CMG eventually hired other electrical contractors to complete the work at City View and 87 Iroquois. (Tr. at 232.)
CMG filed a $5,090 bond with the Court Registry on November 16, 2001, and on January 4, 2002, Plaintiff filed an amended petition to enforce its mechanics' lien against CMG's bond. This case was tried before the Superior Court on January 9, January 10, and January 13, 2003.
IV. Parties' Claims
 A. City View
Plaintiff argued at trial that for work and materials at City View, CMG and Ashford (CMG-Ashford)[4] owe it the following amounts: $700 (Lot 3); $125 (Lot 4); $1,750 (Lot 5); $295 (Lot 7); and $1,925 (Lot 8). Plaintiff's Post-Trial Memorandum at 2. In total, Plaintiff claims CMG-Ashford owes it $4,795. Id.
CMG-Ashford, alternatively, asserts that expenses to complete and fix Plaintiff's work, combined with resulting delays, additional management costs, and finance charges, exceed the amount Plaintiff claims is due. Specifically, CMG-Ashford claims Plaintiff owes it $31,208.08 for the work at City View. CMG-Ashford's claimed damages include management and supervision costs that resulted from workers reviewing things with people hired to make corrections, assessing the stage of progress in which the lots were left, and dealing with the realtor and town officials. (Tr. at 195.) Moreover, CMG-Ashford maintains that the management fees are based on hours incurred in additional oversight and supervision to find replacement electricians, to deal with the realtor, and to deal with the building inspector's office. (Tr. at 216-17.) CMG-Ashford prorated the management and supervision costs per lot, accounting for disparities in the time spent at each lot. (Tr. at 197.) Additionally, CMG-Ashford's claimed damages reflect the compounded daily interest that CMG-Ashford paid the bank on construction loans for the houses. (Tr. at 199.) CMG-Ashford calculated this interest for the time period extending from the pulling of the rough permit for the electrical work until the house's closing. (Tr. at 200.)
1. Lot 3 (7 Violet Street)
Plaintiff began work on Lot 3 on March 20, 2001 and completed his last day of work on April 12, 2001. (Tr. at 34.) At trial, Plaintiff argued that it completed, with a few exceptions, the following items of work:
Record and Date Item of Work Price
DeSimone Electric Invoice No. 200 amp. service $300 2597 (4/12/01) DeSimone Electric Invoice No. 10 recessed fixtures $450 2597 (4/12/01) DeSimone Electric Invoice No. 2 dedicated circuits $160 2597 (4/12/01) DeSimone Electric Invoice No. 3 duplexes $45 2597 (4/12/01) DeSimone Electric Invoice No. 4 dimmers $40 2597 (4/12/01) DeSimone Electric Invoice No. Rough installation $1,500 2598 (4/12/01) (Plaintiff's Exhibits 4A and 4B.)
Plaintiff concedes that CMG-Ashford paid it $1,500 for the rough installation (Tr. at 31). Therefore, it claims it is owed a total of $700, an amount which allegedly accounts for Plaintiff's failure to complete certain finish work. Alternatively, CMG-Ashford claims it is owed a total of $7,016.14 in damages for Lot 3, which is made up of the following items:
Record and Date Item of Work Price
Town of Johnston Permit (11/01/01) Electrical permit reinspection fee $30
Town of Johnston Permit (3/14/01) Electrical permit fee $80
CMG Invoice No. 264 (12/14/01) Management and supervision fees $2,000
Builder's World Invoices (8/15/01) Various installations $1,430
Chart generated by CMG-Ashford Interest paid to bank from 4/12/01 $3,363.64[5]
 to 1/30/02
Kevin Cam Electrical Contractor Bath fan light combination $112.50
quotation (9/6/01)
(Defendants' Exhibits A and J.)

Plaintiff and CMG-Ashford dispute Lot 3's level of completion. DeSimone initially testified that he completed the rough wiring and the installation of 200 amp. service, extra recessed lights, some dedicated circuits, and some duplexes. (Tr. at 29, 32). He later stated, however, that Plaintiff did not install the three duplexes or the dimmers, and did not complete the finish work. (Tr. at 29, 32.) While J. Colucci initially testified that Plaintiff completed the rough wiring on Lot 3, he later stated that he hired Builder's World to complete it. (Tr. at 193.) James Colucci also testified that Lot 3 was "not even half done" and that Builder's World performed some of the finish work. (Tr. at 187, 193.)
2. Lot 4 (9 Violet Street)
Plaintiff initiated work on Lot 4 in April of 2001 and performed his last day of labor on May 2, 2001. (Tr. at 38.) CMG-Ashford paid Plaintiff $1,500 for the rough wiring on Lot 4. (Defendants' Exhibit B2.) Plaintiff, however, argues it is owed a total of $125 for "living up" the basement plug, "living up" and installing weather proof outside plugs, and installing the rough wiring in the garage. (Tr. at 37; Plaintiff's Exhibit 5A (DeSimone Electric Invoice No. 2617 (7/19/01.)) CMG-Ashford, on the other hand, claims that Plaintiff owes it $5,215.10 (Tr. at 205; Defendants' Exhibit J), an amount comprised of the following items of damage:
Record and Date Item of Work Price
Town of Johnston Permit (11/29/00) Electrical permit fee $80
CMG Invoice No. 264 (12/14/01) Management and supervision fees $500
Builder's World Invoices (8/15/01) Various installations $1,710
Kevin Cam Electrical Contractor Bath fan/light combinations $112.50
Quotation (9/6/01)
Chart generated by CMG-Ashford Interest paid to bank from $2,812.60[6]
 3/23/01 to 11/21/02
(Defendants' Exhibit B and J.)

While DeSimone testified that Plaintiff completed the rough installation and "most likely" performed rough wiring for the garage (Tr. at 131-132), Defendant claims that Plaintiff only completed a certain portion of the rough wiring and that the job was "not even half done." (Tr. at 186-187.)
3. Lot 5 (8 Violet Street)
Plaintiff began work on Lot 5 on May 7, 2001 and ceased on May 11, 2001. (Tr. at 39-40.) Plaintiff argues that CMG-Ashford owes it $1,750 for performing the rough wiring and installation of 100 amp. service at Lot 5 (Tr. at 41; Plaintiff's Exhibit 6A (Invoice No. 2606 (5/16/01)). CMG-Ashford, however, claims that Plaintiff owes it a total of $6,578.34, comprised of the following items of damage:
Record and Date Item of Work Price
Town of Johnston Permit (11/1/01) Electrical permit reinspection fee $60
Town of Johnston Permit (11/7/01) Electrical permit reinspection fee $30
Town of Johnston Permit (2/28/01) Electrical permit fee $80
Zanni Electric Invoice No. 3420 Installation of 3 cables, installation $370
(11/8/2001) of 3 phones, and 4 total cans
Zanni Electric Invoice No. 3396 10 repair and cut circuits in attic, $825
(10/29/01) 4 rewire 4-way switch, 4 rewire
 3-way switch, and to feed boiler and
 hot water tank and vent wire in
 boiler emergency switch
Kevin Cam Electric Contractor Installation of a fan light control $112.50
Quotation (9/6/01)
CMG Invoice No. 264 Management and supervision fees $3,000
(12/14/01)
Chart generated by CMG- Interest paid to bank from $2,100.84[7]
Ashford 5/16/01 to 11/15/01
(Defendants' Exhibit C.)

As to Lot 5's level of completion, DeSimone testified that Plaintiff completed the basic service installation and rough wiring, which did not include the controlled wiring, installation of 100 amp. service, or wiring for major appliances within the house, but did include supplying feed to the furnace. (Tr. at 132.) DeSimone admitted that Plaintiff did not perform the finish work and, therefore, Plaintiff did not install circuit breakers to the house. (Tr. at 41, 88.) J. Colucci, however, testified that Plaintiff only completed a certain portion of the rough wiring and was overall "not even half done." (Tr. at 186-87.)
4. Lot 7 (7 Mascio Drive)
Plaintiff initiated work at Lot 7 during March of 2001 and ceased labor on May 1, 2001. Plaintiff argues it performed the following items of work:
Record and Date Item of Work Price
DeSimone Electric Invoice Installation of plug and $250 No. 2626 (7/16/01) switch DeSimone Electric Invoice Installation of 1 phone jack $20 No. 2576 (2/14/01)[8]
DeSimone Electric Invoice Installation of 1 television $25 No. 2576 (2/14/01) jack DeSimone Electric Invoice Installation of 150 amp. $650 No. 2575 (2/14/01) service (Plaintiff's Exhibit 7A, 7B, and 7C.)
As CMG-Ashford paid Plaintiff $650 for installing the 150 amp. service, Plaintiff claims it is owed a total of $295. (Plaintiff's Exhibit 7C.; Tr. at 47.)[9] Defendant, conversely, claims Plaintiff owes it $8,922.02 (Tr. at 212), comprised of the following items:
Record and Date Item of Work Price
Town of Johnston Permit Electrical permit fee $80
Town of Johnston Permit (11/1) Electrical permit reinspection fee $30
Mechanical Systems Misc. work $250
Builder's World Misc. work $1,850
Zanni Electric Misc. work $380
Kevin Cam Electric Contractor Complete and correct work $112.50
CMG Invoice No. 264 Management and $2,500
(12/14/01) supervision fees
Chart generated by CMG-Ashford Interest paid to bank from $3,719.52[10]
 1/28/01 to 12/18/01
(Defendants' Exhibits J and D.)

With regard to Lot 7's degree of completion, DeSimone testified that Plaintiff completed the rough wiring, installed the upgraded service, started to install the plugs and switches (which constitutes part of the finish), and installed the phone and television jacks. (Tr. at 43-44.) DeSimone later testified that Plaintiff only performed the rough installation of the phone and television jacks, and did not do the finish work. (Tr. at 89.) James Colucci testified that Plaintiff only completed a certain portion of the rough wiring and was "not even half done." (Tr. at 186-187.)
5. Lot 8 (10 Mascio Drive)
Plaintiff began work at Lot 8 at some point in April or on March 23, 2001 and ceased labor on July 17, 2001. (Tr. at 48, 53.) Plaintiff alleges that CMG-Ashford owes it $1,925, an amount comprised of the following items:
Record and Date Item of Work Price
DeSimone Electric Invoice Installation of 1 fan light $125 No. 2594 (3/23/01) combination DeSimone Electric Invoice Installation of 1 ground $30 No. 2594 (3/23/01) fault interrupter DeSimone Electric Invoice Installation of 3 single pull $45 No. 2594 (3/23/01) switches DeSimone Electric Invoice Installation of 1 over sink $25 No. 2594 (3/23/01) fixture
DeSimone Electric Invoice Installation of 3 air conditioning $300 No. 2596 (3/31/01) dedicated circuits* DeSimone Electric Invoice Installation of 1 Jacuzzi $150 No. 2596 (3/31/01) fault interrupter breaker* DeSimone Electric Invoice Installation of 100 amp. service $500 No. 2610 (5/26/01) DeSimone Electric Invoice Installation of devices and fixture $750 No. 2610 (5/26/01) (Plaintiff's Exhibits 8A and 8B; Tr. at 93-94.) *Considered part of the rough wiring.
James Colucci, on the other hand, argues that Plaintiff owes CMG-Ashford a total of $3,556.48 (Tr. at 52), based on the following items of damage:
Record and Date Item of Work Price
Town of Johnston Permit Electrical permit fee $80 (11/29/00) Town of Johnston Permit Reinspection fee $30 (7/17/01) Statement (6/3/02) Labor homeowner had $258 someone else perform[11]
CMG Invoice No. 264 Management and supervision $2,000 (12/14/01) fees Chart generated by CMG-Ashford Interest paid to bank from $1,446.48[12]
3/23/01 to 7/27/01 (Tr. at 216; Defendants' Exhibit E 14.)
DeSimone testified that, at Lot 8, Plaintiff performed the finish work and completed the installation with the exception of a hood fan. (Tr. at 49, 53.) James Colucci testified that Plaintiff completed the rough wiring and some of the finish, and that the house was "close to being complete" and "pretty much done." (Tr. at 187, 216.)
B. 87 Iroquois
Plaintiff performed work at 87 Iroquois from August of 2000 until February (Tr. at 173) or April of 2001. Plaintiff argues that it had performed $9,410 worth of work when it ceased labor. (Tr. at 12, Plaintiff's Exhibit 3E.) It is undisputed that J. Colucci paid Plaintiff $6,000. (Tr. at 21, 227.)[13]
Plaintiff, therefore, claims J. Colucci owes it $3,410. (Tr. at 139, Plaintiff's Exhibit 3E.)
J. Colucci, on the other hand, claims that damages to complete Plaintiff's allegedly defective work, coupled with resulting delays, additional management costs, and finance charges exceed the amount Plaintiff claims is due. More specifically, J. Colucci alleges that he is owed $2,590 for work performed incorrectly or incompletely at 87 Iroquois. (Tr. at 230, Defendant's Exhibit I.)
 STANDARD OF REVIEW
In a non-jury trial, the trial justice acts as a trier of fact and law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). He balances and considers the evidence, determines the credibility of the witnesses, and draws appropriate inferences. Id. In fact, in a bench trial, the job of ascertaining witnesses' credibility is "peculiarly the function of the trial justice."Walton v. Baird, 433 A.2d 963, 964 (R.I. 1981). See alsoRodriques v. Santos, 466 A.2d 306, 312 (R.I. 1983) (stating that "[t]he question of who is to be believed is one for the trier of fact"). Moreover, "[i]t is also the province of the trial justice . . . to draw inferences from the testimony of witnesses. . . ." Id.
 PLAINTIFF'S COMPLAINT Petition to Enforce Mechanics' Lien
A mechanics' lien is "[a] statutory lien that secures payment for labor or materials supplied in improving, repairing, or maintaining real or personal property, such as a building, an automobile, or the like." Black's Law Dictionary 935 (7th ed. 1999). Plaintiff moves this Court to enforce its mechanics' lien against CMG and Ashford for labor performed and materials supplied at City View. CMG-Ashford, however, argues that this Court should dismiss Plaintiff's mechanics' lien petition in reliance on Sells/Greene Building Co., LLC v. Rossi, a Superior Court decision in which it was held that the Rhode Island Mechanics' Lien Law violates procedural due process and is, therefore, unconstitutional. No. Civ.A. PB 02-1019, Civ.A. PB 02-2778, 2003 WL 21018168, at *16 (R.I. Super Ct. Apr. 23, 2003).See also Kinetic Systems, Inc. v. R.I. Industrial FacilitiesCorp., No. KM 02-0616, 2003 WL 22048520, at *1 (R.I. Super Ct. Aug. 4, 2003) (following Rossi and dismissing the claimant's mechanics' lien petition). The Rhode Island Supreme Court is currently reviewing the Mechanics' Lien Law's constitutionality. Plaintiff claims that, in light of a recent amendment, the mechanics' lien statute is constitutional.
This Court, finding the reasoning in Rossi persuasive, holds that the Rhode Island Mechanics' Lien Law is unconstitutional because it violates procedural due process. The United States Supreme Court, in determining the amount of process that a property owner should receive prior to or after a deprivation, applies the following test:
 "[1] consideration of the private interest that will be affected by the prejudgment measure; [2] an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and [3] . . . principal attention to the interest of the party seeking the prejudgment remedy, with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." Connecticut v. Doehr, 501 U.S. 1, 11, 111 S.Ct. 2105, 2112, 115 L.Ed.2d 1, 14 (1991).
Applying the first prong of this test, this Court finds that a mechanics' lien affects a significant private interest. As the Court in Rossi noted, the recording of a notice of intention damages an owner's clear title to land, infringes upon his or her ability to sell or alienate the property in other ways, could damage the owner's credit rating, and could cause a mortgagor to default on a mortgage containing an insecurity clause. Rossi,
2003 WL 21018168, at *13.
This Court determines that the Rhode Island Mechanics' Lien Law allows a substantial risk of erroneous deprivation, and further finds that there exists a high probable value of additional or alternative safeguards. To record a notice of intention, the lienor need only provide a sworn statement. See R.I. Gen. Laws § 34-28-4. The Court in Rossi pointedly emphasized that once the lienor records the notice of a lien, the aforementioned consequences take effect without a judicial determination that the lien is valid, a judge's examination of the notice of intention, or an opportunity for the owner to challenge the "truth, accuracy, or validity of the amounts claimed under the lien." Rossi, 2003 WL 21018168, at *14. Moreover, the statute does not provide for a hearing before or immediately after the filing of the lien, but only at an unspecified point in time after the filing of the petition to enforce the lien. Id. at *5-6. Furthermore, the property owner must initiate this opportunity for hearing. Id. at *15. This Court similarly finds all of the above violative of procedural due process.
Additionally, this Court finds that the recent amendment to the mechanics' lien statute fails to address the concerns expressed in Rossi and reiterated here. The amendment states, in pertinent part:
 "Dismissal of petition for other cause — (1) If any person in interest, including, but not limited to, an owner or contractor claims: (a) that any person who has provided labor, materials or equipment or has agreed to provide funding, financing or payment for labor or materials or equipment refuses to continue to provide such funding, financing or payment for labor materials solely because of the filing or recording of a notice of intention; or (b) it appears from the notice of intention that the claimant has no valid lien by reason of the character of or the contract for the labor, materials or equipment and for which a lien is claimed; or (c) that a notice or other instrument has not been filed or recorded in accordance with the applicable provisions of R.I.G.L. 38-28-1 et. seq.; or (d) that for any other reason a claimed lien is invalid by reason or failure to comply with the provisions of R.I.G.L. 38-28-1 et. seq., then in such event, such person may apply forthwith to the superior court for the county where the land lies for an order to show cause why the lien in question is invalid, or otherwise void, or the basis of the lien is without probability of a judgment rendered in favor of the lienor." R.I. Gen. Laws § 34-28-17.1(1).[14]
This Court notes that the amended statute is constitutionally infirm as it makes no provision for a hearing before the filing of the lien, does not delineate precisely when after the lien's filing the hearing will take place, and still requires the property owner to initiate any opportunity for a hearing.
Concurring with the Court in Rossi, this Court similarly finds that the Rhode Island Mechanics' Lien Law "is so lacking in minimal constitutional protections that the potential governmental burden that an additional procedural requirement would entail is far outweighed by the benefits incident to the fundamental principles of due process." Id. at *16. Finding the Rhode Island Mechanics' Lien Law unconstitutional, even as amended, this Court dismisses Plaintiff's petition to enforce its mechanics' lien.[15]
 Breach of Contract
In addition to its petition to enforce its mechanics' lien, Plaintiff further asserts that J. Colucci breached its contract with Plaintiff because Plaintiff performed labor at and supplied materials for 87 Iroquois and J. Colucci has failed to pay Plaintiff a balance of $3,410. Defendant argues that Plaintiff cannot recover under the oral contract between the parties because Plaintiff did not substantially complete its work at 87 Iroquois.
I. Contract Between DeSimone Electric and J. Colucci
This Court finds that an enforceable oral contract existed between Plaintiff and J. Colucci concerning 87 Iroquois. With respect to the writing requirement of the Statute of Frauds, service contracts do not fall within the Statute of Frauds.Levit v. Kutcher, 28 Pa. D. C. 4th 14 (Ct. Com. Pl. Pa. 1996);see R.I. Gen. Laws § 9-1-4. While agreements "not to be performed within the space of one year from the making thereof" fall within the Statute, R.I. Gen. Laws § 9-1-4, it is well-settled that "a contract which, within the contemplation of the parties, was possible of performance within one year from the making thereof does not fall within the statute even though performance of the contract actually turns out to have extended . . . more than one year." In re Klausner's Will, 77 N.Y.S.2d 775, 787 (Sur. Ct. 1948). As the contract between J. Colucci and Plaintiff is a services contract and could, in contemplation of the parties, be performed within a one year period, it does not fall within the Statute of Frauds and thus is enforceable without a writing.
If a contract is oral, "it is the duty of the trial court to determine the meanings to be given words and the intention of the parties." 11 Williston § 30:8. In a non-jury trial, the trial justice acts as a trier of fact. Hood, 478 A.2d at 184. Where the evidence concerning an oral contract's terms conflicts, "it is for the trier of fact to pass upon the facts and determine the terms of the contract." 11 Williston § 30:8. The standard of interpretation to be applied to an oral contract consists of "the standard of reasonable expectation," which entails "giving the words used the meaning that the speaker expected, or should have expected, them to convey." Id. at § 31:2. The construction of, or the determination of the legal effect of, an oral contract, presents a question of law. Hood, 478 A.2d at 184.
This Court further finds that the agreement between J. Colucci and Plaintiff meets the general requirements for an enforceable contract. A contract first requires mutual assent. Steven G.M. Stein, Construction Law § 3.10[1][a] (2003); Filippi v.Filippi, 818 A.2d 608, 623 (R.I. 2003). Mutual assent does not necessarily require a "meeting of the minds" or "an absolute concurrence." Stein, Construction Law § 3.10[1][a]. Rather, mutual assent means that "the parties have manifested to each other what can reasonably be construed to be an intention to be bound by their agreement." Id. This intent to be bound "is found in the conduct of the parties, and the subjective intent of either party is largely irrelevant." Id. Additionally, a contract requires consideration. Hayes v. Plantations SteelCo., 438 A.2d 1091, 1094 (R.I. 1982). The "same rules of consideration apply to oral contracts as are applicable to written contracts." 3 Samuel Williston, Williston on Contracts
§ 7:8 (4th ed. 1999). An exchange of promises fulfills the consideration requirement. See Filippi, 818 A.2d at 624.
Furthermore, "a contract, to be enforced, must be sufficiently certain and specific so that what was promised can be ascertained." Kenneth D. Laub Co., Inc. v. Bear Stearns Cos.Inc., 262 A.D.2d 36 (N.Y. App. Div. 1999); Stein, ConstructionLaw § 3.10[1][b]. In a services contract, the scope of the work to be performed and the amount of compensation constitute two essential terms. Stein, Construction Law § 3.10[1][b]. However, "the presence of an established price term is not always essential to a binding agreement." Kenneth D. Laub Co., Inc.,262 A.D.2d 36. "Where at the time of the agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties" by, for example, "reference to an extrinsic event [or] commercial practice or trade usage." Id.
Applying the contract principles to the evidence before it, this Court finds the following. J. Colucci's walk-through with DeSimone, Plaintiff's performance of work at 87 Iroquois, and J. Colucci's partial payment for the work constitute objective manifestations of the parties' mutual assent. Moreover, consideration exists for the agreement between J. Colucci and Plaintiff as the two parties exchanged promises; that is, Plaintiff promised to perform certain work and J. Colucci promised to pay Plaintiff a certain amount.
Furthermore, a sufficiently definite agreement existed between J. Colucci and Plaintiff. During the walk-through, J. Colucci showed Plaintiff the work he wanted performed, and although the parties now dispute the agreed-upon price, this Court finds that at one point the parties agreed upon a price for the work. More specifically, this Court finds that Plaintiff and J. Colucci agreed upon a price of $6,800 for Plaintiff's work at 87 Iroquois. This Court does not find persuasive DeSimone's varied explanations for the $4,500 discrepancy between the price at which he estimated the installation on the permit fee and the price upon which he claims the parties agreed.[16] Finding that mutual assent, sufficient definiteness, and consideration are all present, this Court concludes that Plaintiff and J. Colucci entered into a valid oral contract for certain work to be performed at 87 Iroquois for $6,800.
II. Substantial Performance
It is well-settled that a contractor who substantially performs may recover the contract price, minus "a fair allowance to the owner for defective work." Dimario v. Heeks, 116 R.I. 44, 48,351 A.2d 837, 839-840 (1976). In other words,
 "where . . . [a] builder has not willfully deviated from the specifications of a contract and all that remained to be done in order to constitute performance within the meaning of the contract is of a trivial or minor nature, the builder is entitled to recover the contract price with adjustments made by the court to compensate . . . [the owner] for the unfinished or unsatisfactory work."
Ferris v. Mann, 99 R.I. 630, 636, 210 A.2d 121, 124 (1965). The converse is true: a contractor cannot recover on a building contract, however, where he does not substantially perform.Ferris, 99 R.I. at 636, 210 A.2d at 124; Dimario, 116 R.I. at 46, 351 A.2d at 838. Moreover, the substantial performance doctrine does not apply where the contractor's performance is valueless and the work has to be totally redone. Nat'l Chain Co.v. Campbell, 487 A.2d 132, 135 (R.I. 1985). In such case, the contractor is responsible for the cost to the owner of having the work redone. Id.
The determination of whether a contractor's performance is substantial is "a matter of degree and should be made relatively to all the other complex factors in a case." Dimario, 116 R.I. at 46, 351 A.2d at 839 (internal quotations omitted). Most cases require "a careful quantitative and qualitative comparison between what was done and what should have been done." Id. at 47, 351 A.2d at 839. Even so, there may exist instances where "the work remaining to be done is so extensive or the quality of what has been done so poor that the performance may rather easily be characterized as unsubstantial." Id. Moreover, "the percentage of the omitted work may in and of itself be sufficient to show that the performance was not substantial." Ferris, 99 R.I. at 636, 210 A.2d at 124. Whether a contractor has substantially performed presents a question of fact. Nat'l ChainCo., 487 A.2d at 135.
An analysis of the extent and quality of Plaintiff's work at 87 Iroquois demonstrates that Plaintiff failed to substantially perform.[17] With respect to the degree of completion of Plaintiff's work at 87 Iroquois, DeSimone testified that Plaintiff completed the installation of 200 amp. service, rough wiring, all device installation, and installation of most of the fixtures. DeSimone conceded that Plaintiff's work at 87 Iroquois was not one hundred percent complete and that Plaintiff did not complete the wiring underneath the cabinet and the installation of some fixtures. (Tr. at 11-12.)
James Colucci testified that Plaintiff's work at 87 Iroquois was 80 or 85% complete. (Tr. at 173.) He conceded that Plaintiff completed the rough wiring and installation of 200 amp. service;[18] wiring, plugging, and switching; the installation of some fixtures; wiring of the boiler; rough wiring on two of three air handlers; wiring for appliances; installation of panel boxes; and wiring of the water pump. (Tr. at 170-172.) James Colucci further testified that Plaintiff failed to wire the air conditioning units and three units on outside of the house; never installed an outlet on the side of the burner; and did not provide lighting to all areas. (Tr. at 173.)
With respect to the quality of Plaintiff's work at 87 Iroquois, at trial, J. Colucci, presented evidence of various defects through his testimony and a series of photographs. This evidence revealed that Plaintiff failed to install the wires connected to the puck lights directly behind the lights, leaving bunches of rolled wire visible; Plaintiff, rather than using a utility knife to cut around the edge of the box of certain light switches, broke the plaster by hand, leaving a chip in the plaster that extends beyond the coverage of the light switch plates; when installing the wall sconces, Plaintiff failed to center them between the windows; Plaintiff installed the power outlets crookedly and at different heights from the floor; and Plaintiff installed crookedly the light switch plates and a lamp. (Tr. at 223-26, Exhibit F.) J. Colucci further testified that Plaintiff left the worksite untidy. (Tr. at 222.)
J. Colucci's testimony, which this Court finds credible, demonstrates that Plaintiff failed to complete fifteen to twenty percent of the work at 87 Iroquois. Moreover, even DeSimone conceded at trial that Plaintiff did not complete the job, failing to install some fixtures and to complete the wiring under the cabinet. Additionally, the photographs presented at trial depicting Plaintiff's work provide competent evidence that the work Plaintiff did perform consisted of poor quality. Finally, J. Colucci's claim of $2,590 in damages for work performed incorrectly or incompetently, compared with the agreed upon price of $6,800, further demonstrates Plaintiff's insubstantial performance. Accordingly, this Court finds that Plaintiff failed to substantially perform and thus cannot recover under the contract.
 DEFENDANT'S COUNTERCLAIMS Breach of Contract
Defendants assert that Plaintiff, by failing to perform certain obligations, breached its contract concerning City View with CMG and its contract regarding 87 Iroquois with J. Colucci. Defendants claim that they have consequently incurred substantial damages.
In the absence of an agreement to the contrary, "[w]here a person contracts to perform work . . ., he promises to perform in a workmanlike manner and to exercise reasonable care." Stein,Construction Law § 3.10[1][b] (internal quotations omitted). Accordingly, every contract for work or services contains an implied duty to perform skillfully, carefully, diligently, and in a workmanlike manner. Davis v. New England Pest Control Co.,576 A.2d 1240, 1242 (R.I. 1990). Negligent failure to keep any of these conditions constitutes a breach of contract. Id.
I.J. Colucci v. DeSimone Electric — 87 Iroquois
This Court finds that Plaintiff breached its contract with J. Colucci concerning work to be performed at 87 Iroquois. A review of the evidence presented at trial reveals that Plaintiff failed to perform skillfully, carefully, and in a workmanlike manner. As mentioned earlier, Plaintiff failed to install the wires directly behind the puck lights, leaving wire visible; broke by hand the plaster around the edge of the box of certain light switches, leaving a visible chip in the plaster; failed to center the wall sconces between the windows; installed the power outlets crookedly and at different heights; installed crookedly the light switch plates and a lamp (Tr. at 223-26, Exhibit F); left the worksite untidy (Tr. at 222); and improperly wired the burner. (Tr. at 172.) Additionally, the evidence demonstrates that Plaintiff did not perform diligently as it failed to complete the job, leaving 15 to 20% of the work unfinished. Accordingly, this Court finds that Plaintiff breached its contract with J. Colucci for work to be performed at 87 Iroquois.
II. CMG and Ashford v. DeSimone Electric — City View
Plaintiff also breached its contract with CMG-Ashford for work to be performed at City View. As with 87 Iroquois, the evidence presented at trial concerning Plaintiff's work at City View reveals that Plaintiff failed to perform skillfully, carefully, and in a workmanlike manner. Kevin Campopiano, a subcontractor hired by CMG to complete and rectify Plaintiff's work, noted the following problems with Lot 3: that the trim and fan motor for the bath fan light were missing, the hood fan feed wire was missing, the cellar lighting was not done, the garage outlet box was not installed, the cellar smoke box was not installed, and the 4-way switch box for landing was not installed. (Defendants' Exhibit A13.) With regard to Lot 4, Kevin Campopiano noted that the range wire, dryer wire, and washer wire were not installed. (Id.) Defendant also provided evidence that Lot 5 had problems with cross polarity in the hallway, small bedroom, and master bedroom. (Defendants' Exhibit C12.) Finally, Lot 8 failed inspection because a live wire at the front of the garage needed an octagon box and a fixture, a plate was missing a dryer outlet, and the ground fault interrupter markings needed to be verified in the garage. (Defendants' Exhibit E12.)
The evidence further demonstrates that Plaintiff failed to work diligently. James Colucci testified that on a couple of occasions, Plaintiff was late in initiating his work. (Tr. at 184.) Moreover, on July 20, 2001, CMG sent DeSimone a letter informing him that Plaintiff was behind schedule and holding up progress on Lots 3, 4, 5, 7. From the evidence before it, this Court finds that Plaintiff breached its contract with CMG concerning the work to be performed at City View.
 Negligence
Defendants J. Colucci, CMG, and Ashford further assert that with regard to the work they performed at City View and 87 Iroquois, Plaintiff was negligent and failed to perform in a workmanlike manner. Defendants claim that they consequently incurred substantial damages. Plaintiff, however, argues that Defendants presented no credible evidence at trial that Plaintiff's work was unworkmanlike.
Contracts for work or services contain an implied duty on behalf of the individual performing service or work to perform skillfully, carefully, diligently, and in a workmanlike manner.Davis, 576 A.2d at 1242. Negligent failure to keep any of these conditions constitutes a tort. Id. Moreover, a contractor possesses a duty not to "negligently and wrongfully injure and damage the property of another." Nat'l Chain Co., 487 A.2d at 136.
I.J. Colucci v. DeSimone Electric — 87 Iroquois
From the testimony detailing the quality of Plaintiff's work, it is clear to this Court that Plaintiff, in the work it performed at 87 Iroquois, breached its duty to perform skillfully, carefully, diligently, and in a workmanlike manner. As previously mentioned, Plaintiff failed to install the wires directly behind the puck lights, leaving wire visible; broke the plaster around the edge of the box of certain light switches by hand, leaving a visible chip in the plaster; failed to center the wall sconces between the windows; installed the power outlets crookedly and at different heights; installed crookedly the light switch plates and a lamp (Tr. at 223-26, Exhibit F); left the worksite untidy (Tr. at 222); and improperly wired the burner. (Tr. at 172.) Additionally, the evidence demonstrates that Plaintiff did not perform diligently as it failed to complete the job, leaving 15 to 20% of the work unfinished.
Plaintiff alleges that its failure to center the wall sconces is excused by the absence of any written lighting layout plan. The evidence at trial, however, demonstrates that a layout plan did exist, although J. Colucci deviated from it to some extent. Nevertheless, this Court finds that even if no plan existed, there exists substantial evidence enumerated above, aside from Plaintiff's failure to center the wall sconces, that Plaintiff failed to use skill, care, and diligence. Accordingly, this Court finds that Plaintiff was negligent in the work it performed at 87 Iroquois.
II. CMG and Ashford v. DeSimone Electric — City View
This Court likewise finds that Plaintiff breached its duty to perform its work at City View skillfully, carefully, diligently, and in a workmanlike manner. As detailed earlier, at Lot 3, Plaintiff failed to install the trim and fan motor for the bath fan light, the hood fan feed wire, the garage outlet box, the cellar smoke box, and the 4-way switch box for landing. (Defendants' Exhibit A13.) Plaintiff also failed to complete the cellar lighting. (Id.) Moreover, at Lot 4 Plaintiff failed to install the range wire, dryer wire, and washer wire. Lot 5, furthermore, exhibited problems with cross polarity in the hallway, small bedroom, and master bedroom. (Defendants' Exhibit C12.) Lot 8 failed inspection because a live wire at the front of the garage needed an octagon box and a fixture, a plate was missing a dryer outlet, and the ground fault interrupter markings needed to be verified in the garage. (Defendants' Exhibit E12.) J. Colucci testified that overall Plaintiff's work was "sloppy" and Plaintiff failed to clean up, leaving the houses unclean. In total, Plaintiff's work failed inspection at Lots 3, 5, 7, and 8.
The evidence further demonstrates that Plaintiff failed to work diligently. Plaintiff was late in initiating his work on some occasions (Tr. at 184) and, as of July 20, 2001, Plaintiff was behind schedule and holding up progress on Lots 3, 4, 5, and 7. Moreover, J. Colucci testified that Plaintiff failed to meet deadlines and that the work's level of completion varied from lot to lot.
 DAMAGES
The claimant in a breach of contract action must prove the amount of damages sustained from the breach with "a reasonable degree of certainty" and "by competent evidence." Nat'l ChainCo., 487 A.2d at 135. He or she "must establish reasonably precise figures and cannot rely upon speculation." Id. Courts will not deny a claimant recovery because the damages are difficult to determine as long as they are proven with reasonable certainty. Id. "Proof of the cost to repair or replace defective work or complete incomplete work is generally made by demonstrating the actual cost which the owner has expended or expects to expend to have another contractor perform the work." Stein, Construction Law § 11.02[2][a].
Furthermore, "[a]dditional interest costs due to an extended borrowing term are considered to be direct damages." Id. at § 11.02[6][c]. "[A]n accurate measure of the owner's damage attributable to interest costs would be to calculate the interest paid during the period from the original contract completion date through the actual completion date." Id.
This Court finds that Defendants are entitled to receive the costs expended on permits and in hiring outside parties to finish or correct work at City View and 87 Iroquois because Defendants have proven such costs through testimony and exhibits with a reasonable degree of certainty. Accordingly, this Court grants Defendants $10,666 in damages.[19]
Defendants, however, are not entitled to recover their claimed management and supervision fees as they have failed to satisfy their burden of proving such damages to a reasonable degree of certainty or by competent evidence. Defendants submitted their claims for management and supervision fees on a CMG-generated invoice, providing no explanation, either through testimony or exhibits, of what specific management and supervision functions they performed at each lot to result in their prorated values or to reach the total amount of management and supervision fees claimed. Defendants likewise failed to provide any information as to the days upon which they performed such functions or the amount of time they spent at each lot performing these functions.
Similarly, Defendants have failed to satisfy their burden of proving their claimed damages as to interest to a reasonable degree of certainty or by competent evidence, and thus are not entitled to recover said damages. Defendants submitted self-generated documentation of these damages without any accompanying loan documentation. Moreover, even though J. Colucci testified that the work at each City View lot should have taken 2.5 to 3 months to complete, Defendants presented no evidence that the parties specifically contracted for the work to be completed within a certain amount of time. Therefore, any calculations Defendants made as to interest owed relies on speculation.
 CONCLUSION
This Court dismisses Plaintiff's petition to enforce its mechanics' lien as it finds that the Rhode Island Mechanics' Lien Law, even as amended, is unconstitutional. This Court further finds that Plaintiff may not recover for breach of contract against CMG-Ashford for its claims with regard to 87 Iroquois because Plaintiff did not substantially perform. Moreover, this Court finds that Plaintiff breached its contract with J. Colucci for work to be performed at 87 Iroquois and with CMG for work to be performed at City View. Finally, this Court finds that Plaintiff was negligent in its performance of work at both 87 Iroquois and City View. This Court grants Defendants $10,666 in damages for the costs expended on permits and in hiring outside parties to finish or correct work at City View and 87 Iroquois. This Court, however, denies Defendants recovery as to their claims for management and supervision fees and interest as Defendants have failed to prove said claims to a reasonable degree of certainty or by competent evidence.
[1] Plaintiff did not charge by materials or by the hour.
[2] However, Plaintiff performed controlled wiring at Lot 8.
[3] During a "walk-through," the contractor points out to the electrician any lights that are "out of the ordinary"; however, the contractor generally expects the electrician to follow codes concerning switching and plugging. (Tr. at 168.)
[4] Although CMG is responsible for City View's development, Plaintiff occasionally received payments from Ashford, CMG's sister corporation.
[5] Defendants have adjusted this value to $2,330.44 to account for an overstatement of interest damages by three months.Defendants' Post-trial Memorandum at 17.
[6] Defendants have adjusted this value to $1,779.40 to account for an overstatement of interest damages by three months.Defendants' Post-trial Memorandum at 17.
[7] Defendants have adjusted this value to $1,067.64 to account for an overstatement of interest damages by three months.Defendants' Post-trial Memorandum at 17.
[8] Plaintiff's counsel conceded at trial that Plaintiff's work on February 14, 2001, represented by Invoice No. 2576, falls outside the mechanics' lien period of 120 days. (Tr. at 90.)
[9] CMG-Ashford also paid Plaintiff $1,250 for the rough wiring and service.
[10] Defendants have adjusted this value to $2,686.32 to account for an overstatement of interest damages by three months.Defendants' Post-trial Memorandum at 17.
[11] CMG-Ashford neglected to include the $258 in its total claim for damages. (Tr. at 55; Defendants' Exhibit E).
[12] Defendants have adjusted this value to $413.28 to account for an overstatement of interest damages by three months.Defendants' Post-trial Memorandum at 17.
[13] J. Colucci made payments to Plaintiff as follows: $1,500 on October 6, 2000; $1,500 on October 17, 2000; $2,000 on October 20, 2000; and $1,000 on December 20, 2000.
[14] This amendment took effect on July 17, 2003, and applies to all mechanics' liens, petitions, or lien substitutions under R.I. Gen. Laws § 34-28 that were pending at that time.
[15] This Court, therefore, need not address Defendants' argument that Plaintiff did not adequately describe and locate the labor and materials expended at City View as this issue is moot.
[16] Finding that Plaintiff and J. Colucci entered into a contract for $6,800, this Court need not address Plaintiff's argument concerning unjust enrichment and quantum meruit. SeePlaintiff's Post-Trial Memorandum, at 13.
[17] In assessing Plaintiff's performance, this Court is mindful that the parties have failed to provide disinterested expert testimony regarding the extent or quality of Plaintiff's work.
[18] Plaintiff admits that it received $1,500 for the rough wiring.
[19] This figure is comprised of the following amounts: $1,652.50 (Lot 3); $1,902.50 (Lot 4); $1,477.50 (Lot 5); $2,702.50 (Lot 7); $368 (Lot 8); and $2,590 (87 Iroquois).